[Civ. No. 2310. Fourth Appellate District.—August 22, 1939.]

HENRY J. ADAMS, Respondent, v. R. E. HARRISON et al.,
Appellants.

Luce, Forward & Swing, Stearns, Luce, Forward & Swing and Fred Kunzel for Appellants.

Dempster McKee, Hillyer & Boldman and Bertrand L. Comparet for Respondent.

BARNARD, P. J.—This is an action for the recovery of secret profits claimed to have been made by the defendants through a real estate transaction. A jury brought in a verdict for $11,000 in favor of the plaintiff and the defendants have appealed from the ensuing judgment. The defendant R. E. Harrison, who will be referred to as the appellant, was a real estate agent in San Diego and practically the sole owner of two corporations named R. E. Harrison Co. and Rae Investment Company.

The respondent, who resided in Ohio, had met the appellant, during a visit to San Diego in 1921. On April 10, 1922, the appellant sent a telegram to the respondent, saying he had just obtained a 30-day contract on the Otay ranch, consisting of 7,000 acres, praising its investment possibilities and asking the respondent to buy it. About that time the appellant contracted to purchase from a Mr. Judson about 6,360 acres of land known as the Otay ranch, and by a separate contract agreed to purchase from Judson an additional 1,000 acres which adjoined the Otay ranch. Both parcels were thereafter frequently referred to by the parties as the "Otay Ranch". On April 1, 1922, Judson deeded the 1,000 acres to the Rae Investment Company and on June 2, 1922, he deeded the 6,360 acres to R. E. Harrison Co. In each in-

stance the grantee company executed a mortgage to secure the balance of the purchase price, and the deeds and mortgages were all recorded. The purchase price for both tracts was $155,000. The appellant took possession of the property in September, 1922, made certain improvements thereon and leased portions thereof to various tenants, who placed about 2,500 acres under cultivation. The appellant loaned certain amounts to several of the tenants, taking back crop mortgages, which were recorded. He also placed signs at the four entrances to the ranch and smaller signs at intervals around the boundary thereof, warning against trespassing, which signs contained the words: "Otay Ranch, R. E. Harrison Co., Owners".

During the latter part of February, 1923, the respondent came to San Diego and was taken over the ranch by the appellant. On March 2, 1923, he was given an option reading, in part, as follows:

"For and in consideration of the sum of One ($1.00) Dollar to me in hand paid, the receipt of which is hereby acknowledged, I hereby give to H. J. Adams of Fostoria, Ohio, the option to purchase from me within thirty (30) days from this date an undivided one-half (½) interest in and to the Otay Rancho and the one thousand (1000) acres, more or less, belonging to me and adjoining the Otay Rancho on the north, making a total acreage of seven thousand three hundred sixty (7360) acres more or less.

"The purchase price of said undivided one-half (½) interest to be the sum of Ninety-five Thousand ($95,000.00) Dollars, payable as follows:" (Here follows terms of payment, including a provision that the respondent was to assume one-half of the encumbrance on the property.)

On April 11, 1923, the respondent exercised this option and on June 13, 1923, a one-half interest in these lands was conveyed to him and the appellant wrote him saying, "I am this day deeding to you an undivided one-half interest in the Otay Rancho, consisting of 6360 acres, and 1000 acres, more or less".

About the time this option was given the parties were negotiating for the purchase of another tract of 3,435 acres, known as the National ranch, which is not directly involved in this action. On March 6, 1923, the appellant sent a letter to the respondent at Los Angeles in which he said: "I have got everything signed on the dotted line this after-

noon. After whittling everything down to the last dollar I find that the tract will cost approximately $78,250.00. I made Jones come through with some of his commission — therefore this price. I have got everything in escrow and will have the deed within a very few days. I am taking it in my name and then will redeed you a half interest. There will be approximately 3435 acres." He further asked the respondent to send him $10,000, stated that he would let him know in a few days the exact amount of the respondent's "*pro-rata*" share of the cost, and that on the next day he would send him "a contract for us between ourselves". The next day the appellant sent the respondent a contract setting forth that "I hereby agree to deliver to Henry J. Adams of Fostoria, Ohio, an undivided one-half interest in and to", followed by a description of the property, providing that the full purchase price for said undivided one-half interest was to be $39,125.00, and providing for terms of payment.

From and after April 11, 1923, the ranch properties were operated by the respondent and the appellant as partners, the latter being in active charge. Trouble arose between them in 1925. After two agreements had been entered into in an attempt to adjust their affairs a final agreement was executed on April 8, 1926, as a result of which the appellant got the Otay ranch and the respondent got the National ranch.

It appears, without conflict, that the appellant, as above stated, paid $155,000 for the Otay ranch and charged the respondent $95,000 for a one-half interest therein, and that he represented the cost of the National ranch to be $78,250, when in fact the purchase price was $51,500. The National ranch transaction is not directly involved here and the appellant contends, with respect to the Otay ranch, that he was dealing with the respondent at arm's length, that he had owned the Otay ranch for about a year prior to the present transaction, that he had a legal right to sell a one-half interest to the respondent at a profit, and that no partnership relationship existed between them until after that sale had been made, when they became partners in the operation of the ranch. The respondent contends, on the other hand, that the case is one where a secret profit was obtained by one partner or joint adventurer through taking advantage of the other.

■· The first point raised is that there is a fatal variance between the allegations of the complaint and the proof. The complaint is one for money had and received. A demurrer was overruled and the appellant answered denying the allegations of the complaint and setting up as a separate defense that the cause of action was barred by the statute of limitations. A bill of particulars was demanded and the one furnished stated that the amount sued for was received on or about March 2, 1923, and that the circumstances under which the appellant received the money were ''in connection with the purchase from C. S. Judson of a tract of land located in San Diego County, California, known as the Otay Ranch''. The appellant contends that the complaint which was filed on May 15, 1937, contained no allegation of fraud, fraudulent representation, or of a secret profit, and further, that although the bill of particulars discloses that the cause of action, which is based upon fraud, arose more than three years before the complaint was filed, the complaint contained no allegations showing when the fraud was discovered or giving facts and circumstances justifying the delay in bringing the action.

■ In support of this contention the appellant relies upon cases which have held that one seeking relief from a court of equity against fraud after three years have elapsed must allege in his complaint the time and circumstances of the discovery of the fraud, together with the facts relied upon as excusing an earlier discovery. (*Phelps* v. *Grady,* 168 Cal. 73 [141 Pac. 926]; *Gibson* v. *Rath,* 13 Cal. App. (2d) 40 [55 Pac. (2d) 1219]; *Nighbert* v. *First Nat. Bank of Bakersfield,* 26 Cal. App. (2d) 624 [79 Pac. (2d) 1105].) In such cases, there has been involved the sufficiency of complaints which show upon their face that three years have elapsed since the fraud was committed. Since the complaint in the instant action was in the form of a common count this fact did not appear upon its face. In such a case, a different rule prevails. (*MacDonald* v. *Reich & Lievre, Inc.,* 100 Cal. App. 736 [281 Pac. 106]; *Agee* v. *Virden Packing Co.,* 15 Cal. App. (2d) 691 [59 Pac. (2d) 1058].) In *Philpott* v. *Superior Court,* 1 Cal. (2d) 512 [36 Pac. (2d) 635, 95 A. L. R. 990], the history and present standing of the common count for money had and received is rather thoroughly discussed. In that case the first count was based upon money paid for stock in a bank in reliance upon fraudulent

representations, and the second count was for money had and received. The court there said: "Under the peculiar facts in this case a judgment for plaintiff in the sum of $625, with interest and costs, would fully satisfy his demands. In short, he asks no relief that a court of law may not in all respects give him. This, of itself, would seem sufficient to deny plaintiff a place in a court of equity." The court quoted with approval from Clark on Contracts, as follows: "'A frequent illustration of a *quasi*-contractual obligation of this kind arises where a person obtains another's money by wrongful or fraudulent means. . . . He is not always restricted, however, to an action *ex delicto* for the specific wrong, but may in general waive the tort, and sue in *assumpsit* for the money as for money received for his use. . . . The same is true in any case in which one person, by means of trespass, fraud, or other tortious means obtains another's money.'" The court then held that the action was one at law. Under these authorities, we hold that the complaint in the instant action was sufficient and that there was no fatal variance between the pleading and the proof.

█ It is next contended that the evidence is not sufficient to support the judgment. Among other things, the respondent testified as follows:

"A. He stated he wanted me to go in with him on the purchase of the Otay and National Ranches on a 50–50 basis and at a figure, I was to put up the same amount he was to put up on both properties, in the National and the Otay— property which he stated belonged to Mr. Judson. Q. Did he during these conversations tell you what he was paying for these ranches or what he could get them for? A. He did. Q. Did he say what the basis of your relationship would be after they were purchased? A. We would be joint adventurers, partners in all of the transactions we may go into. Q. Did he say that before you entered into the deal? A. He did. Q. What did he tell you was the cost of the Otay Ranch? A. He said he could get the Otay and one thousand acres adjoining which we always called the Otay, at $190,-000; certain payments down and the rest spread over quite a considerable period."

And again:

"Q. What did he say with respect to what your relationship would be? A. He said that we would buy the Otay and parts of the National Ranches in partnership, and we

would both put up equal sums of money for the partnership and joint adventure, the two deals we were figuring on, on both the Otay and parts of the National Ranch. Q. Did these transactions take place before there was any transaction between you? A. They took place before, in regard to the purchase, and many times after we made a deal."

It is contended that on or about March 1, 1923, when this conversation was had, there was no confidential relation between the parties and that the respondent's cause of action is based entirely upon his claim that when he entered into the transaction he did not know that the appellant was the owner of the property, but believed that he and the appellant were then buying the property from Judson for the price of $190,000. It is then argued that the respondent could not have so believed; that the option itself disclosed on its face that it was an option to purchase from the appellant lands belonging to him; that in the letter of June 13, 1923, the appellant told the respondent "I am this day deeding to you an undivided one-half interest in the Otay Rancho"; that the deed itself was from R. E. Harrison Co.; that the signs on the ranch showed the same thing; that the respondent had seen a certificate of title disclosing the appellant's ownership; and that a certain witness testified that early in 1923 the respondent told him the appellant had purchased the land from Judson.

Much of the evidence thus referred to was denied by the respondent. It must be conceded that portions of the evidence justify the inference that respondent should have known that the appellant had already purchased at least a part of these lands from Judson. There are some facts, however, justifying a contrary inference. The appellant was a real estate agent and had tried to sell the entire property to the respondent in April, 1922, when he said he had obtained a 30-day contract, apparently in the nature of a listing agreement. If it be assumed that the respondent saw the signs on the ranch naming R. E. Harrison Co. as the owner, he may have thought that the appellant's original 30-day contract had been extended but not known that an actual sale had been consummated, especially in view of the appellant's efforts to get him to purchase a half interest in the property. It should be noted in this connection that the option itself stated that the 1,000 acres adjoining the Otay ranch belonged to the appellant, but made no such statement

with reference to the other 6,360 acres. It appears that from the beginning the parties were negotiating not only for the purchase and sale of a one-half interest in the Otay ranch but for the purchase, by the two together, of the National ranch. In his letter of March 6, 1923, the appellant told the respondent he was then buying the National ranch for the respondent and himself, that he had not yet received the contract, that this property "will cost" $78,000, and that "I am taking it in my name and will then redeed you a half interest." In the same letter, he said: "Hoping you will find everything satisfactory and that our mutual interests will never be marred, and that we will each make a 'killing' on our proposition." The proposition and the mutual interests mentioned in this letter may well have been taken by the respondent to refer to both parts of the deal, that is the purchase of both the National and Otay ranches. When the appellant wrote to the respondent on June 13th, saying "I am this day deeding to you a one-half interest in the Otay Rancho," the respondent may have thought that part of the deal was being handled the way the National ranch had been handled, namely, "I am taking it in my name and then will redeed you a half interest." We are pointed to no evidence that the respondent was ever told that the appellant had actually purchased the Otay ranch about a year earlier, and it would not have been entirely unreasonable for the respondent to have thought that the two deals were being handled in a similar manner.

However, if it be conceded that the respondent knew or ought to have known that the appellant had previously purchased the Otay ranch from Judson, that fact is not conclusive. The gist of respondent's cause of action is not that the appellant deceived him with respect to who then owned the ranch, but that he had agreed to sell him a one-half interest in the Otay ranch for what that interest would cost or had cost the appellant; in other words, that it was agreed that each should pay the same amount for his interest in the land. ■ While, as the appellant argues, one may sell his own property to another without disclosing what he himself paid, he may not agree that the other shall become owner of a half interest by paying one-half of the cost of the property and then, by representing that the cost was greater than it was, deceive the other and obtain from him more than he should have paid.

The appellant argues that no confidential relationship existed until the respondent exercised the option and agreed to take an interest in the property on April 13, 1923, and, therefoi , that he was under no obligation to give the true facts to the respondent when the conversations were had on or about the first of March. Those conversations and the acts of the parties over a period of six weeks led directly to the transaction here in question. It clearly appears that the primary purpose of both parties was to obtain the land for speculative purposes. It also appears that the appellant was confronted with financial difficulties in holding the land and that he desired the respondent's assistance. While the appellant insists that there was no partnership between him and the respondent, except later in connection with the operation of the land, the evidence justifies the inference that they went into partnership for the purpose of either buying or holding the land. It matters little, however, whether the arrangement was technically a partnership or a joint adventure. The material and controlling element is whether the respondent entered into the transaction upon the representation and with the understanding that each was to pay the same amount and that they were to share the cost of the ranch whether past or future. If, in fact, there was an agreement that this cost was to be shared equally there was a sufficient confidential relationship between the parties to require the appellant to disclose the true facts with respect to the cost of the land, regardless of the exact date upon which the formation of a partnership was consummated, or a joint adventure begun.

There is no question that such an arrangement was made with respect to the National ranch, which was purchased from Judson after the parties hereto had begun their negotiations, about March 1, 1923. The parties were then negotiating for the sale to the respondent of a half interest in both the Otay and National ranches, a total of about 11,000 acres. In his letter of March 6th, the appellant referred to their "mutual interests" and expressed the hope that they would "each make a 'killing' on our proposition". At that time the respondent had not agreed to buy an interest in either the Otay ranch or the National ranch, and he may well have taken a portion of this letter as relating to the purchase of both ranches and to their mutual interests in the entire proposition involved in their previous conversations. The

evidence supports the finding and conclusion that his purchase of a half interest in the Otay ranch was to be, like that of the National ranch, on a 50–50 basis, each party to pay an equal share of the cost of the land. The appellant required the respondent to pay to him one-half of the amounts he had advanced to tenants upon the land. Many of the circumstances shown by the evidence indicate that the respondent was justified in understanding and believing that he was purchasing a one-half interest in the Otay ranch by paying one-half of the cost thereof to the appellant, and that such cost was to be shared equally by them. While there is considerable conflicting evidence the question was one of fact for the jury, and its finding thereon is not without support.

It is next contended that it appears as a matter of law that the action was barred by the statute of limitations and that the evidence conclusively shows that the respondent, as a reasonable man, was put upon inquiry, that means of knowledge were open to him, and that a reasonable inquiry would have developed the true facts. A large part of this argument is devoted to the proposition that information was available which would have disclosed that the appellant had actually purchased the Otay ranch in 1922. In addition to what we have already said on this subject it should be remembered that the respondent lived in Ohio, that the transaction was closed by mail, and that the respondent was in San Diego very little for some years thereafter. The important consideration is whether circumstances existed which put the respondent upon his guard with respect to the action of the appellant in charging him more than his proportion of what the land had cost, and whether means of knowledge were open to the respondent which, if pursued, would have disclosed the true facts in that regard. The appellant relies upon the fact that trouble developed between the parties in 1925 and 1926 over the management of the ranch and the payment of existing obligations, which led to an agreement separating their interests, and which left the parties with considerable ill-will toward each other. There was some evidence that the respondent, after that time, told certain parties that the appellant had defrauded him in connection with the settlement of their affairs. Not only is that evidence contradicted by the testimony of the respondent but knowledge of wrongdoing on the part of the appellant in

that connection could hardly be said, as a matter of law, to have put the respondent upon notice and to have required him to make an investigation as to the acts of the appellant in originally entering into the transaction.

Moreover, it does not appear that means of knowledge were then open to the respondent or that any reasonable inquiry on his part would have developed the true facts with respect to the real fraud, which is here in issue. It appears that after he had received an intimation of this fraud, in 1936, the respondent went to Judson, from whom the land had been purchased, to Judson's attorney and to the real estate agent who had represented Judson, all of whom refused to give him any information on that subject. It does not appear that an earlier inquiry would have been more successful, and it is not to be anticipated that the appellant would have been any more helpful had an inquiry been made of him. While there is a great deal of evidence upon this subject, the only thing that clearly appears therefrom is that it is sharply conflicting in the respect now under consideration. From the record before us it cannot be said, as a matter of law, that the action was barred or that sufficient excuse was not shown for a failure to make an earlier discovery of the true facts. Again the question was one of fact for the jury. It may be said here as was said in *Victor Oil Co.* v. *Drum,* 184 Cal. 226 [193 Pac. 243] :

"Without some information which carried a direct implication or suggestion of possible fraud, the plaintiff could not be put upon inquiry. The courts will not lightly seize upon some small circumstance to deny relief to a party plainly shown to have been actually defrauded against those who defrauded him on the ground, forsooth, that he did not discover the fact that he had been cheated as soon as he might have done. It is only where the party defrauded should plainly have discovered the fraud except for his own inexcusable inattention that he will be charged with a discovery in advance of actual knowledge on his part. The present case is not of that character."

█ The next points raised are that the court erred in excluding testimony as to the value of this land and in refusing to instruct the jury to the effect that the measure of the respondent's damages, if any, would be the difference between the money he paid for the property and the value of the property he received. It is argued that since the ac-

tion was in fact based upon fraudulent representations the measure of damages is fixed by section 3343 of the Civil Code. That section has no application in this case where, in the manner pointed out in *Philpott* v. *Superior Court, supra*, the respondent waived the tort and sued for the return of his money. In such an action the actual value of the land is not material and has nothing to do with the amount which the plaintiff has paid and which he seeks to have returned. (*King* v. *Wise*, 43 Cal. 628; *Fink* v. *Weisman*, 129 Cal. App. 305 [18 Pac. (2d) 961].)

 It is next urged that the court erred in admitting evidence concerning the sale of an interest in the National ranch to the respondent. While it is conceded that this evidence disclosed that the appellant had secured a secret profit in that deal it is argued that it was an entirely separate transaction and that evidence of a prior or subsequent fraud is not admissible. Not only was this evidence admissible for the purpose of showing intent (*Atkins Corporation* v. *Tourny*, 6 Cal. (2d) 206 [57 Pac. (2d) 480]; *Evans* v. *Gibson*, 220 Cal. 476 [31 Pac. (2d) 389]), but it had a direct relation to the entire transaction and was admissible to prove the existence of a confidential relationship between the parties at that time and before the option for the purchase of the Otay ranch was exercised by the respondent. It is further urged that the court erred in excluding evidence of public knowledge of the fact that the Otay ranch was owned by the defendant. The only thing referred to in this connection is that the court excluded an article supposed to have appeared in a newspaper published in San Diego. This article was published while the respondent was in Ohio, it did not show that the appellant owned the land in question, and a great deal of other evidence was admitted by the court for the purpose of showing such public knowledge. No reversible error appears in this connection.

 Some contention is made that the differences between the parties were completely adjusted by the contracts of settlement which finally resulted, in 1936, in the appellant taking back the Otay ranch. That settlement had nothing to do with the original transaction here in question, and the facts upon which this action is based were not then known to the respondent. In so far as shown by the evidence, that settlement purported to settle certain matters between the

parties and made no pretense of settling all of their differences or affairs.

The judgment appealed from is affirmed.

Griffin, J., and Haines, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 15, 1939, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 20, 1939.