[Civ. No. 17475. Second Dist., Div. Two. Dec. 22, 1950.]

HERBERT KENT, Appellant, v. FIRST TRUST & SAVINGS BANK OF PASADENA (a Banking Corporation), as Executor, etc., Respondent.

Daly B. Robnett and Benjamin F. Kosdon for Appellant.

Reynolds, Painter & Cherniss for Respondent.

WILSON, J.—Ignoring the established rule that on appeal this court will view the evidence in the light most favorable to the prevailing party, plaintiff-appellant in this action has recited only that evidence which is favorable to him.

The action was brought against the executor of the estate of Mara McKee, deceased, to recover on a rejected claim on a promissory note signed by decedent. Plaintiff is appealing from the judgment after a verdict in favor of defendant.

The note, for the principal sum of $30,000, is dated November 4, 1943, payable to plaintiff's order three years after date, with interest at the rate of two per cent per annum payable at maturity. Mrs. McKee died prior to the maturity date of the note and no payments of either principal or interest had been made thereon.

As affirmative defenses defendant alleged that (1) there was no consideration for the note and (2) it was obtained by undue influence.

Mara McKee was a wealthy widow, leaving at her death an estate worth in excess of a half million dollars. Her assets consisted mainly of government and mining corporation bonds, corporate shares in select insurance and oil companies and cash. On February 1, 1941, she had appointed defendant her agent for the management of her estate.

For some years preceding her death she was under regular medical care and treatment. Among other afflictions she suffered from high blood pressure and in June, 1943, she had a slight stroke. She had periods of mental confusion and during 1942 and 1943 there was a gradual decline and breakdown in her physical and mental powers. She suffered from lapses of memory with increasing frequency. At the time she executed the note she was about 77 years of age.

Plaintiff was about 57 years of age when he first met Mrs. McKee in August, 1940. He had had wide experience in various phases of the oil and gas business in California, including the drilling of wells and the selling of oil lands in various counties. He arranged an introduction to her pursuant to a scheme concocted with one Harry White for the purpose of selling her speculative oil lands which White had sought unsuccessfully to interest her in purchasing during the month of July, 1940. White had no interest in these lands but had

an arrangement whereby he could procure deeds on paying the sum of $40 an acre to an individual who owned various parcels of land in Kings County.

White told plaintiff that Mrs. McKee was a wealthy widow and that it would be necessary to obtain her confidence before attempting any sale to her. Shortly after meeting Mrs. McKee plaintiff told White that "the lady would be pretty good for a big deal." Plaintiff and White then discussed the most feasible method of selling her the land and agreed between them that the approach should be made by plaintiff's introducing White to Mrs. McKee; that White would represent to her that he was blocking out oil lands for large companies and that she had an opportunity to make an advantageous purchase. Actually, White was not employed by any oil company which plaintiff well knew. Although some of the major oil companies owned property in Kings County and had drilled for oil, none of them had any flowing wells. In fact no oil had ever been discovered in that locality.

Plaintiff called at Mrs. McKee's residence and by prearrangement White telephoned him there requesting permission to see him at her home. White then came to the house and was introduced to Mrs. McKee, who failed to recognize him although but a month previously he had endeavored to sell her speculative oil lands. Plaintiff told Mrs. McKee that White was blocking out lands for major oil companies and that plaintiff had persuaded White to "let her in on the ground floor." Mrs. McKee agreed to purchase 160 acres which she would pay for by securities which she had in her safety deposit box. White and plaintiff accompanied her to the bank and she handed plaintiff a group of securities telling him to pick out whatever stocks he desired. Plaintiff selected certificates representing 200 shares of Corn Products Company which Mrs. McKee endorsed and gave back to him. Plaintiff transferred them to White, who sold the shares for approximately $33,800 and out of the proceeds paid $6,200 to purchase the property which was conveyed to Mrs. McKee and $16,200 to plaintiff as his share of the profits, retaining the balance.

At the conclusion of the first transaction plaintiff stated to White: "Before we are going to be through with this lady we should be able to get at least a quarter of a million dollars." Plaintiff knew that Mrs. McKee had some Standard Oil stock and he suggested to White that they try to sell her some additional land. Using the same tactics they had used in the first sale they succeeded in selling her 20 acres for which she de-

livered to White 240 shares of Standard Oil Company stock. He sold this stock for $4,400 and paid $800 for the land which was conveyed to Mrs. McKee and $1,950 to plaintiff as his share, keeping the balance of the proceeds, amounting to $1,650, for himself.

Two or three weeks later plaintiff and White in the same manner induced Mrs. McKee to purchase an additional 30 acres of land from White who paid plaintiff $1,800 for his efforts.

After the third transaction Mrs. McKee took a trip to Chicago. At that time plaintiff was in New York and upon learning that she was in Chicago he telephoned White to meet him there, stating that Mrs. McKee kept the bulk of her securities in Chicago and that she had about $60,000 worth of Canadian oil securities which she had told him she was willing to exchange for California properties. White immediately went by airplane to Chicago, meeting plaintiff there the following day. They called upon Mrs. McKee and upon plaintiff's suggestion she agreed to exchange the Canadian bonds for land in California. Before the transaction was consummated, however, Mrs. McKee was advised by her Chicago banker not to make the purchase. She asked plaintiff and White to discuss the matter with her banker, stating that if he would recommend it she would be glad to turn over the stock to them. Plaintiff thought they might invite trouble with respect to the prior sales if they did not comply with her request and therefore sent White who called upon the banker and assured him that they would not sell Mrs. McKee any more speculative investments.

Shortly after their return from Chicago, and in order to recoup the expenses of that trip the two men, using the same methods they had previously followed, persuaded Mrs. McKee to purchase 30 acres of land in exchange for Standard Oil Company stock. Plaintiff told her there was one parcel of real property left in which a major oil company was interested but he had persuaded White to allow her to purchase it. Plaintiff's profit on this transaction amounted to $1,900.

After the latter sale White did not participate in any further sales to Mrs. McKee. Having taken in excess of $50,000 from her he felt that was sufficient and informed plaintiff he did not want to have any further transactions with her. Plaintiff replied that if White did not want to continue making sales to her "I will get somebody else who will."

After the termination of his association with White, plaintiff continued his relationship with Mrs. McKee. He was already addressing her as "Lady Mara" or "Lady McKee." He continued to visit her home at least once a week during 1941, and more frequently in 1942. He dined with her at her home and in public places. He borrowed sums of money from her without security from time to time which by 1943 had totaled as much as $5,000. This was during the time when Mrs. McKee had periods of mental confusion, lapses of memory and when there was a gradual decline and breakdown in her physical and mental powers.

During 1942 plaintiff introduced one Kay Stone to Mrs. McKee. Stone, whom plaintiff had known for many years, was a real estate broker and was associated with one Johnston. Through their joint efforts sales of oil royalties to Mrs. McKee were effected for a purchase price of $21,000. Out of this transaction Stone received a commission which he shared with plaintiff, giving him approximately $1,550. Subsequently Johnston sold some additional royalties to Mrs. McKee. During April of 1943, plaintiff obtained from Mrs. McKee the legal description of one of the royalty interests which she had in her possession, the other instruments being in the possession of her bank. Plaintiff prepared a document for her signature authorizing him to examine the royalty interests held by the bank. He presented this authorization to the bank stating that he desired to see the descriptions on the ground that the royalties were sold to her at too great a profit. Plaintiff was shown and learned the value of the royalties and the dividends which were being paid thereon. The eight royalties had been purchased from Johnston at a total cost of $38,892. Plaintiff by means of a second authorization obtained from the bank photostatic copies of the conveyances of the mineral interests. He thereupon prepared four mineral deeds and four sales of oil and gas royalty instruments providing for the transfer by Mrs. McKee to plaintiff of the royalty interests she had acquired from Johnston.

On July 13, 1943, plaintiff took the deeds he had prepared to Mrs. McKee's residence for the purpose of obtaining her signature to them. On his way there he stopped at a notary's office and made arrangements for the notary to respond to a subsequent telephone call for the purpose of acknowledging the documents. He then proceeded to Mrs. McKee's home and told her that the deeds were ready to be notarized. The

notary was summoned and Mrs. McKee signed seven of the instruments without any conversation concerning them. The eighth document was signed the following day.

Plaintiff paid nothing to Mrs. McKee for the deeds. He did not record them but retained them in his possession. He made no demand upon the bank for the payment of the royalties which it was collecting on behalf of Mrs. McKee nor did he notify any of the companies paying the royalties that he was the owner or entitled to any of the payments. Mrs. McKee continued to collect the royalty payments through the bank and in October, 1943, she sold one of the royalties.

In September, 1943, an attorney acting for Mrs. McKee asked plaintiff what documents she had signed and given to him and of which she had no recollection except that she had signed and delivered them. Plaintiff replied that he had destroyed all the documents which she had signed.

Plaintiff testified that Mrs. McKee gave him the royalties "in consideration of my advice and counsel and my kindnesses over the period of time"; in August, 1943, Mrs. McKee stated to him that she had thought the matter over and that if he recorded the deeds the royalty checks would no longer go to the bank and the bank would wonder what happened to them and harass her; she asked him not to record the deeds and said that in their place she would pay him by cash or by stock or some other way; in the latter part of October, 1943, she said she had thought the matter over and preferred giving him a promissory note; she suggested a note in the amount of $30,000 "because the royalties cost her a little more, but she felt the man who sold them to her had made some money and thought $30,000 would be an equitable sum." A few days later, on November 4, 1943, plaintiff returned to Mrs. McKee's home with the promissory note which he had prepared. No one was present except plaintiff and Mrs. McKee, who signed the note which is the subject of this action and handed it back to him. Plaintiff did not at that time nor at any time subsequently return the royalty deeds to Mrs. McKee nor reconvey to her the interests covered by the deeds.

Plaintiff contends that (1) the evidence was insufficient to support the verdict because there was no proof of want of consideration for the note or of undue influence; (2) the court erred in admitting certain evidence; (3) the court erred in giving and refusing certain instructions; (4) it was error to deny his motions for instructed verdict and for judgment notwithstanding the verdict.

Plaintiff maintains that the consideration for the note was the eight royalties which he agreed to sell back to Mrs. McKee and which were worth $38,892; that the validity of the deeds covering the royalties is not in issue since defendant did not raise that issue in his pleadings and that defendant having introduced those deeds in evidence is bound by the provisions thereof and cannot impeach their validity.

■ That a promissory note was given in exchange for a sufficient consideration is a rebuttable presumption (Code Civ. Proc., § 1963) and. failure of consideration or actual consideration may be proved by parol evidence. (*Sandrini* v. *Branch*, 32 Cal.App.2d 707, 708 [90 P.2d 593]; 19 Cal.Jur. p. 1027, § 169 and cases cited; 8 Cal.Jur.10-Yr.Supp. [1948 Rev.], p. 468, § 169 and cases cited.)

Defendant pleaded as an affirmative defense that the note was procured without consideration. Since, as asserted by plaintiff both at the trial of the action and on appeal, the consideration for the note was the eight royalty deeds which he maintains he agreed not to record but to reconvey to Mrs. McKee, the validity of those deeds is in issue. Moreover, as stated by the court in *McCroskey* v. *Ladd*, 96 Cal. 455, 457 [31 P. 558], "The action upon the note, being between the original parties thereto, is subject to an inquiry into its consideration, *and is also subject to any equities existing between the parties which arise out of the execution of the note, or are connected therewith.*" (Emphasis added.) In the McCroskey case the note and the agreement were executed at the same time, as part of the same transaction. In the instant case the deeds were executed in July and the note in November but they are between the same parties and allegedly the one is consideration for the other. Plaintiff himself testified that shortly after the execution of the deeds Mrs. McKee asked him not to record them, that she wished to give him cash or stock or something else in their place; in October she informed him she would give him a note in lieu of the deeds. The execution of the deeds and the execution of the note are parts of the same transaction and plaintiff cannot divorce them by drawing a curtain on the circumstances surrounding the execution of the deeds and for expediency stating that the deeds were the consideration for the note and that since they exceeded the value of the note *ipso facto* there was consideration for the note. If the deeds which allegedly are the consideration for the note were obtained by undue influence they cannot be a valid consideration.

Plaintiff contends, however, that the exception to the parol evidence rule does not apply to a recitation of consideration in a deed and that evidence of this character is not admissible for the purpose of varying, contradicting or defeating covenants by which rights are expressly vested, citing *Arnold* v. *Arnold*, 137 Cal. 291 [70 P. 23], *Hendrick* v. *Crowley*, 31 Cal. 471, and *Winchester* v. *Winchester*, 175 Cal. 391 [165 P. 965]. It may be conceded that the rule is as laid down in those cases but the obvious answer to plaintiff's contention is that in none of those decisions was fraud or undue influence sought to be proved. ■ Where the validity of a deed is in issue parol evidence is always admissible to show fraud. (Code Civ. Proc., § 1856; *Fernald* v. *Lawsten*, 26 Cal.App.2d 552, 562 [79 P.2d 742].)

■ Ordinarily, as contended by plaintiff, a party who introduces documentary evidence is not allowed to impeach or contradict it but is bound by its recitals for all purposes. This rule does not apply, however, where a document is introduced for the purpose of impeaching it on the ground of fraud. Although usually when offering a document for a specific purpose the offer is limited in some way, where the issues before the court are clear, that is not always necessary. (*Snell Isle, Inc.* v. *Comm'r of Int. Rev.*, 90 F.2d 481, 482; 20 Am.Jur. 771.)

■ There is no merit in plaintiff's contention that a confidential relationship was not pleaded nor proved. It is alleged in the answer that by reason of Mrs. McKee's age and physical condition her mental faculties were impaired and she was easily influenced by those in whom she had confidence; that she reposed trust and confidence in plaintiff and for a long period prior to and after the execution of the note she did whatever he suggested or instructed her to do.

■ The amount of evidence necessary to establish a confidential relationship ordinarily rests with the trier of facts. "It is not essential to show a relationship by affinity or consanguinity, or that the business transacted established a particular relationship between the parties, such as attorney and client or principal and agent. If the parties be friends, and the grantor repose confidence in the grantee, especially if in addition there exist an advisory business relationship, and the one reposing confidence be of advanced age, an implied trust may result." (*Adams* v. *Talbott*, 61 Cal.App.2d 315, 320 [142 P.2d 775].)

At the outset and pursuant to the scheme he had with White, plaintiff deliberately undertook to gain Mrs. McKee's trust and confidence so that he and his companion could obtain from her "at least a quarter of a million dollars." He succeeded in establishing his relationship by flattery, by developing social relations with her, seeing her with increasing frequency, visiting her at her home and escorting her to dinner and lunches. She implicitly followed his advice in her transactions with White. Plaintiff accompanied her to the bank where she withdrew from her safety deposit box securities of substantial value and permitted him to select whichever he desired in effecting the sale of White's land. She gave him access to the records reflecting her business affairs and income. She discussed various business deals of a speculative nature with him.

Plaintiff obtained the legal description in the royalty deeds from the bank; he prepared the instruments conveying Mrs. McKee's interest in the royalties to him, took the documents to her house and made the arrangements to have the notary acknowledge her signature. As stated in *Herbert* v. *Lankershim*, 9 Cal.2d 409, 481 [71 P.2d 220], "The line of authorities is unbroken to the effect that where a confidential relation exists and one of the parties to the relationship has shown great activity in procuring the execution of the instrument by which he or she greatly benefits by the transaction, the activity of such person becomes an important factor for the court or jury to consider in determining whether the transaction was free from undue influence. If such relations are found to exist the burden of showing that no undue advantage was taken shifts to the other side."

There is no evidence, other than plaintiff's testimony, of the circumstances surrounding the transfer of the royalty deeds and the execution of the promissory note. ■ Alleged declarations of a deceased grantor are the weakest evidence that may be produced. (*Cox* v. *Schnerr*, 172 Cal. 371, 379 [156 P. 509]; *Herbert* v. *Lankershim, supra* at p. 472.) ■ Moreover, it is presumed that a decedent would contradict the testimony of a living witness that during her lifetime she gave away her property. (*Bard* v. *Kent*, 35 Cal. App.2d 434, 437 [95 P.2d 957]; *Estate of Reinicke*, 44 Cal. App.2d 271, 277 [112 P.2d 311].)

■ The evidence and the reasonable inferences therefrom are ample to establish as a fact that the relationship between

plaintiff and Mrs. McKee was a confidential one. The burden, then, was upon plaintiff to overcome the presumption of undue influence by evidence that is clear, positive, uncontradicted and of such a nature that it could not rationally be disbelieved. (*Bank of America* v. *Crawford*, 69 Cal.App.2d 697, 701 [160 P.2d 169]; *Hicks* v. *Reis*, 21 Cal.2d 654, 661 [134 P.2d 788]; *Blank* v. *Coffin*, 20 Cal.2d 457, 461 [126 P.2d 868].)

This burden plaintiff has failed to sustain. Mrs. McKee was 77 years of age and was under medical care. Her physician testified that during the years 1942 to 1944 she suffered from high blood pressure, dizzy spells, blurred vision, lapses of memory for periods of time and in 1943 there was evidence of sclerotic changes. Considering her age and physical condition and that plaintiff from the beginning sought to gain her confidence for the avowed purpose of obtaining her money and property, the jury was justified in believing that he obtained the royalty deeds from Mrs. McKee by undue influence and in rejecting his testimony that she gave him the deeds, which were admittedly worth $38,892, in consideration of services rendered by him.

Plaintiff asserts that the court erred in overruling his objections to the interrogation of White and himself regarding the transactions between them and whether he received any money or checks between 1939 and November 4, 1943. Plaintiff testified he had rendered services for Mrs. McKee and it was proper to determine what those services were and whether he had been compensated. The testimony of White that he told plaintiff he had been out to see Mrs. McKee and was unable to sell her any speculative oil properties and that plaintiff should see what he could do with her but should gain her confidence before he tried to sell her was competent, relevant and material. It was admissible as tending to impeach plaintiff's testimony that he had rendered kindnesses and services to Mrs. McKee and to show the inception of the confidential relationship between plaintiff and Mrs. McKee. (*Adams* v. *Harrison*, 34 Cal.App.2d 288, 300 [93 P.2d 237].) It was also admissible to show the formation of a scheme and conspiracy to defraud Mrs. McKee (*People* v. *Gordon*, 71 Cal.App.2d 606, 628 [163 P.2d 110]) and to show that it was logically inferable that plaintiff sought her confidence for the purpose of obtaining her property. (Code Civ. Proc., § 1870(15).)

Plaintiff urges it was error for the court to permit

White to testify concerning the visit to the bank where Mrs. McKee kept her securities. The testimony was admissible as tending to prove the existence of the confidential relationship and the obtaining of Mrs. McKee's property through scheme, artifice and fraud. Moreover, plaintiff did not object to a long series of questions concerning what he, White and Mrs. McKee talked about at the bank and after they returned to her home.

Plaintiff complains of the admission into evidence of a cashier's check in the sum of $6,200 and the testimony of White that the check represented a part of the purchase price of the land which he and plaintiff had sold to Mrs. McKee. The evidence was admissible as indicating plaintiff's course of conduct in profiting from the confidential relations and providing the basis for an inference by the jury of the abuse and violation of that confidence and trust.

Plaintiff asserts the court erred in allowing Mrs. McKee's physician to testify concerning his professional services to her from 1936 to 1939 and from January, 1942, to November, 1944. Evidence of the physical and mental condition of Mrs. McKee was admissible and pertinent to the determination of her mental condition which was an issue. There is no merit in the claim that the testimony is remote as that bears only on the probative value to be given to such evidence and not to its admissibility. (*Estate of Pierce,* 32 Cal.2d 265, 273 [196 P.2d 1].)

Plaintiff complains that it was error to allow a witness to testify that plaintiff had stated he had destroyed all the documents Mrs. McKee had signed. He maintains that since the conversation was nearly two months before Mrs. McKee executed the note, it was irrelevant. That testimony has a direct bearing upon the issues. Plaintiff maintains that the consideration for the note was the reconveyance of the royalty interests referred to in the deeds which he said he had destroyed. The evidence was admissible as it tended to indicate a guilty knowledge by concealment. (*Longmire* v. *Kruger,* 80 Cal.App. 230, 241 [251 P. 692].)

Plaintiff contends it was error to admit the testimony of Stone that he gave plaintiff a commission of $3,300 on the sale to Mrs. McKee of $21,000 worth of oil royalties. The evidence was admissible as indicating a course of conduct pertinent to the issues in the case and to show the influence plaintiff exerted over Mrs. McKee to the extent that she

invested large sums of money in whatever he chose to have her purchase.

Plaintiff assigns as error the giving of certain instructions because there was no evidence to justify them or if there was evidence it was improperly admitted. He maintains that since there was no pleading of fraud or undue influence as to the royalty deeds, which he asserts constituted good and valid consideration for the note and since there was no proof of a confidential relationship and no proof of undue influence or that any advantage was gained by plaintiff in procuring the note, the instructions were not within the issues of the case. The evidence of undue influence in obtaining the royalty deeds, the validity of which was in issue, the advantage gained thereby and the consequent failure of consideration for the note and the admissibility of such evidence has been hereinabove pointed out. Plaintiff's objections to the instructions are therefore untenable.

 Plaintiff contends it was reversible error for the court to refuse to give certain instructions which he requested. The court is not required to give every instruction requested even if considered by itself it may state a correct and pertinent principle of law. All that is required is that the jury be fully and fairly instructed on all the issues presented. (*Estate of Bucher*, 56 Cal.App.2d 135, 137-8 [132 P.2d 257].) An examination of all the instructions given reveals that the omitted instructions are all substantially covered by other instructions which correctly state the law. If the subject matter of the proposed instructions is substantially incorporated in others which the court has given, it is not error to refuse a requested instruction. (*Luis* v. *Cavin*, 88 Cal.App.2d 107, 115 [198 P.2d 563].)

In view of the conclusions hereinabove set forth that the evidence supports the verdict and the implied findings of the jury, plaintiff's contention is without merit that his motion for a directed verdict was improperly denied and that the motion for judgment notwithstanding the verdict should have been granted.

Judgment affirmed.

Moore, P. J., and McComb, J., concurred.