[Civ. No. 26221. Second Dist., Div. One. Apr. 24, 1963.]

SARA E. PRYOR, a Conservatee, etc., Plaintiff and Respondent, v. THOMAS N. BISTLINE et al., Defendants and Appellants.

438

Don C. Bercu for Defendants and Appellants.

Samuel M. Salmon and Patrick B. Phelan for Plaintiff and Respondent.

WOOD, P. J.—This is an action to recover money allegedly obtained by defendant Thomas N. Bistline by undue influence and fraud; to recover money received by defendant Carol D. Bistline with knowledge of said alleged wrongful acts; and to impose a constructive trust upon money and other property so obtained by defendants.

In a nonjury trial, the judgment provided: (1) that defendant Thomas N. Bistline convey to plaintiff the amounts on deposit, in his name, in several specified bank accounts and savings and loan accounts in the aggregate amount of $193,-077.19; (2) that both defendants convey to plaintiff a bank deposit of $334.97, standing in their names; (3) that if they did not return such deposits, then plaintiff should re-

cover the respective amounts from the respective defendants; (4) that plaintiff recover from Thomas N. Bistline an additional amount of $2,275, and from both defendants an additional amount of $1,165; (5) and recover interest and costs in the amount of $16,153.41. (Total judgment $213,005.59.)

Defendants appeal from the judgment.

Appellants contend that the finding that a confidential relationship existed between defendant Thomas Bistline and plaintiff was erroneous; that the court, after having erroneously concluded that such a confidential relationship existed, erred further in requiring defendants to assume the burden of proof as to the issues of undue influence and fraud. Appellants argue that, in the absence of such a presumption, the findings of undue influence and fraud are not supported by the evidence.

Plaintiff Miss Sara E. Pryor, a retired nurse, about 74 years of age, resided alone in an apartment in Long Beach for several years. Through her investments in corporation stocks and bonds she had accumulated assets of the approximate value of $300,000, and about nine-tenths of that amount was money on deposit in banks and a savings and loan company in Long Beach. She lived in a manner which indicated that she was in poor financial condition. Her main recreational interests were walking on the beach, attending public lectures, and reading newspapers and periodicals at the public library. She concealed from her four sisters, two brothers, and other relatives the fact that her wealth was substantial. Two of her sisters, who live in New York and with whom she corresponded frequently, had accumulated substantial wealth. Her sister, Mrs. Mary Bistline, 83 years of age, lives in Alhambra, and plaintiff Sara had visited her about once a month for several years. This sister (Mary) is the mother of defendant Thomas N. Bistline. He is a salesman, 40 years of age, and lives a few blocks from his mother's home. (He will be referred to herein as Thomas.) During several years preceding the illness of plaintiff Sara (hereinafter referred to), he had seen her infrequently— probably two or three times a year at his mother's home. Defendant Carol D. Bistline is Thomas' wife. Plaintiff Sara had not had any communication with her brothers or the other sister for several years.

On July 29, 1960, Sara went alone to the beach at Santa Monica. Late in the afternoon a lifeguard found her lying on the beach unconscious and deeply sunburned. She was

taken to a hospital in Santa Monica about 4:15 p.m. where she was given emergency treatment. Then she was taken to the County General Hospital where she remained until August 3, 1960. She was not oriented as to time or place, and did not know her name or the names or addresses of relatives or friends. She talked incoherently, was distractable, had no concern for the future, and did not know the nature and extent of her property. Examination showed that she was suffering from acute heat prostration, an acute slowing of the blood flow to the head, lowered blood pressure, a severe chronic brain syndrome which had been exaggerated by the beach incident, and senile psychosis. She complained of headaches. In the opinion of attending physicians, Drs. Warick and Reid, she was not competent on August 3 (when she left the hospital) to understand the nature of business or banking transactions or the nature and extent of her property. In the opinion of Dr. Reid it would be about three weeks after the beach incident of July 29 before there would be a distinct improvement in her mental condition, and there is a gradual improvement up to approximately six weeks.

On August 3, plaintiff left the hospital against medical advice. On that day when Mr. Martinelli and Miss Harrison (friends of Sara) and Mary Bistline (her sister) arrived at the hospital, Sara said she was glad to see them and was wondering how she would get back to Long Beach. She also said that her head felt pretty bad, but otherwise she felt well enough to go home. According to Mr. Martinelli's testimony, Dr. Reid said (in the presence of Sara and those visitors) that Sara should stay in the hospital three or four more days. The hospital record of August 3d shows: "She is signing out AMA." (Those letters mean "Against Medical Advice.") It seems that Sara did not "sign herself out," that is, she did not sign the release. On August 3, about 3 p.m., after Sara had put on her clothing, she walked to the elevator, and at that place she was told that the hospital rules required that she leave in a wheel chair. After leaving in a wheel chair, she entered Mr. Martinelli's automobile, where she and the three visitors discussed whether to take her to Long Beach or to her sister Mary's apartment in Alhambra. It was agreed that she should be taken to Mary's apartment. While traveling there, Sara said that she had a headache. While going from the automobile to the apartment she vomited. After she was in the apartment she lay on the bed and appeared to be fatigued. She remained at that apartment until August 11th.

On August 2, about 6 p.m., after defendant Thomas Bistline became aware that his Aunt Sara was missing, he went to her apartment in Long Beach, and knocked on the door but there was no response.

On August 3 Thomas arrived at his mother's apartment about an hour after Sara arrived there, and he said she appeared to be fatigued, and he asked her continually if she was feeling all right and if there was anything he could do for her. He testified that about two hours after Mr. Martinelli and Miss Harrison left the apartment, his Aunt Sara told him that she had $300,000; he said he was surprised to hear that she had that much; she said, "I wonder where my books are"; he asked his mother where the books were or if she had seen them; she replied that she had them, and then she presented the passbooks (Sara's six bank passbooks and one savings and loan passbook); he asked Sara what she was going to do with all this money; she replied that she did not know and did not care, and that she had had her fun in making the money; she said she would like to give him some of it; he asked if there was anything he should do for it; she replied there was nothing he would have to do; he said he was interested in the stock, and he asked her to explain what the stocks were; she replied regarding the General Electric and Mt. Diablo stock; she expressed concern about her apartment, a jar of jelly there, the lights and windows; she asked him to go there and check those things; he complied with her request and returned to his mother's apartment, but he does not remember whether he had any conversation with Sara at that time.

Thomas testified further that he saw Sara on the morning of August 4th and he asked her whether she was still serious about the possible transfers and gifts or whatever she had in mind the night before; she replied, "Yes, as far as I am concerned"; he asked her how they should go about transferring these; she told him to find out and get the necessary information as to procedures and formalities; she said she wanted him to have the three Bank of America accounts.

Her bank accounts were as follows:

| | |
|---|---|
| Bank of America, 3rd and Long Beach, .. | $41,235.35 |
| Bank of America, 1st and Pine, ......... | 58,628.64 |
| Bank of America, 4th and Pine, ........ | 47,573.07 |
| National City Bank of Long Beach, ..... | 39,925.13 |
| Farmers and Merchants Bank, ......... | 10,100.00 |
| Security-First National Bank, .......... | 58,607.38 |

She had an account in the Long Beach Federal Savings Association in the amount of $15,612.30, which stood in her name as trustee for her sister Nelle Pryor, of New York.

On August 4, after said alleged conversation with Sara, Thomas and his wife went to the Bank of America, 1st and Pine Streets, in Long Beach. He had all the passbooks with him. He told the assistant cashier of that bank that he wanted to transfer his aunt's account to a joint tenancy account in the names of Sara and himself, that at that time she was in the hospital and was unable to pay the bills, and that by transferring the account he could pay the hospital and doctor bills. He did not mention that it was a gift to him. Then they (defendants) went to the Security-First National Bank. The vice president of the bank testified that Thomas said that his aunt was ill and that they were trying to get her affairs into such a shape that they could take care of her, and he asked how that could be handled; the banker replied that if she was not competent or able to sign, that guardianship would be one way to do it; he (banker) suggested that Thomas talk to the trust officer of the bank regarding the transfer. The trust officer testified that Thomas said that Sara was ill or had a stroke, was hospitalized, and he was trying to help her; the trust officer discussed guardianship or conservatorship with him; he replied that he would think about it. Thereafter, on that day (August 4) he went to the other banks and the savings association where she had accounts (except the Bank of America at 3rd and Pine) and obtained signature cards.

On August 5, Thomas went to the Bank of America in Alhambra and obtained three withdrawal forms for the transfer of the three Bank of America (Long Beach) accounts; and he went to the Security-First National Bank in Alhambra and obtained a withdrawal slip. He obtained those forms for the purpose of having his aunt sign them so that he could transfer the accounts.

On August 6, at the home of Mary, he and his aunt signed, in blank, the withdrawal slips or transfer cards for all the accounts. Also, on that day, she signed a document which is in his handwriting, and which states as follows:

"Dated August 6th, 1960.

"I, the undersigned, do hereby transfer the three savings accounts at Bank of America, Long Beach, California, to Thomas N. Bistline. At the time of writing this I am of sound mind. The account numbers are: 9386 at First and

Pine Branch 999 at Long Beach Main Branch 1780 at American Avenue Branch. I authorize withdrawal & reassignment of these accounts.''

Sara E. Pryor.''

Mary A. Bistline and Harry Brody signed that document as witnesses.

On August 8, Thomas took Sara to her apartment for the purpose of getting some of her clothing. Thereafter he took her to the Bank of America, Third and Long Beach Streets, where he presented the three signed (in blank) Bank of America transfer cards and the three accounts were transferred to his name alone and into one account at that bank. The assistant cashier testified that he (witness) went to Sara, who was sitting on a bench in the lobby, and asked her if she wished to transfer the funds out of her name; that she replied in the affirmative, and stated further that she was transferring the funds because she had a doctor's report on her physical condition, and she wanted to be assured that her sister Mary would be cared for properly.

Also, on August 8, they went to the Long Beach Federal Savings Association where the account in her name as trustee was transferred to Thomas. Also they signed cards whereby her safe deposit box was placed in their names jointly.

On August 10, Thomas went alone to the Farmers and Merchants Bank and the National City Bank, where he presented the previously signed (in blank) transfer cards, and caused the accounts of Sara at those banks to be made joint accounts in their names.

He did not use the transfer card for the Security-First National Bank account, and that account was not transferred. Thomas testified that on August 6, after Sara had signed the cards, she said she had decided to keep the Security-First National Bank account of $58,000. It is also to be remembered that the vice president and the trust officer at this bank had indicated to Thomas, when he was there to make preliminary inquiries about the transfer, that guardianship or conservatorship might be required in order to make the transfer at this bank.

On the next day, August 11, Thomas took her to her apartment in Long Beach, where she has resided since that time.

On August 12, two days after the transfers were made, Thomas took Sara to the Long Beach Federal Savings Association, where Sara signed a document entitled, ''Deed of Gift,'' before a notary public. That document was prepared

by counsel for Thomas at Thomas' request. This purported to be a document confirming the transfers.

On August 15, Sara went to the Bank of America, 4th and Pine Streets, and presented a check in the amount of $81 for cashing, and a teller said that her account had been closed; she replied that it could not be closed—and she argued about it; another person there showed her a card with her signature on it, and said that her account had been transferred to another branch of the bank at Third and Long Beach. Soon after she left the bank, the assistant cashier telephoned Thomas and said that he was concerned about the condition of Sara. Then Thomas made an appointment with a doctor in San Marino for an examination of Sara on the following day. On August 16 the doctor made the examination and reported that she was suffering from a moderate degree of hypertension and a probable degree of generalized arteriosclerosis. The doctor testified that, in his opinion, she was competent on August 6, 12, and 16, 1960.

Shortly after she had tried to cash the check, she went to see an attorney. This present action was commenced on August 25, and an attachment was levied on the accounts standing in Thomas' name at the Bank of America.

On August 25, the accounts at the Farmers and Merchants Bank and the National City Bank, which were in the names of Sara and Thomas, were closed by him and the amount of each account was transferred, in each bank, to an account in Thomas' name alone.

No consideration was given for any of the transfers of Sara's money. She did not receive any independent advice regarding the transfers.

She testified that she had no recollection of the events pertaining to the transfers of her money to Thomas.

The court found, in part, as follows: Plaintiff did not know the nature and extent of her property or the natural objects of her bounty during the period from July 29, 1960, through August 12, 1960, and for an appreciable time thereafter. During said time plaintiff was mentally incompetent to the extent that she was unable to understand the meaning of the documents which she signed and with which defendant Thomas Bistline effected the transfer of the subject properties; nor did she understand the nature or effect of her acts in entering into the transfers, and she did not at any time form a donative intent to transfer any of her property to either defendant. During the time from August 3, 1960, through August 12,

1960, plaintiff signed certain documents referred to as bank withdrawal slips, signature cards, transfer cards, deeds of gift, etc., pertaining to her savings accounts hereinafter described. On August 8, 1960, money belonging to plaintiff in the amount of $147,377.06 was transferred to Thomas Bistline and is presently on deposit in the Bank of America at the Third and Long Beach Branch, in Long Beach. On August 10, 1960, money belonging to plaintiff in the amount of $50,-025.13 was transferred to plaintiff and Thomas Bistline jointly, and thereafter said Bistline withdrew all funds in that account and disposed of them as follows: . . . (here the court made detailed findings (1) as to amounts, dates, and places where some of the money is now on deposit in savings and loan associations; and (2) as to expenditures of some of the money.) A confidential relationship existed between defendant Thomas Bistline and plaintiff during the time of the subject transfers, which relation invested within said Bistline an unfair advantage in his dealings with plaintiff. The actions of plaintiff relative to the transfers were made by her while: she relied upon the confidence she had reposed in said Bistline; she was suffering from great weakness of mind, and she was susceptible to the suggestions, impositions, and deceptions of said Bistline, and she was relying upon his fraudulent representations as to the nature of the transactions; she was without any substantial disinterested, independent advice; she had received no consideration therefor; said Bistline was the procuring and motivating force in the transfers; she was not acting under her own free will, but under the undue influence of said Bistline. Defendant Carol D. Bistline received $1,500 with full knowledge of plaintiff's rights, title, and interest therein. Plaintiff did not enter into the transfers while in contemplation or fear of death.

Appellants contend, as above stated, that the finding that a confidential relationship existed between Thomas and Sara was erroneous. They argue that the existence of a confidential relationship presupposes some prior course of dealings between the parties, and that since there had been no course of dealings between Thomas and Sara prior to the making of the transfers, a confidential relationship did not exist. Appellants cite several cases (holding there were confidential relationships) wherein the factual situations were that one of the parties, during a considerable period of time, had performed services for the other, such as collecting rents, depos-

iting money, paying taxes, and giving advice on business matters.

In the present case, it is true that Thomas' acquaintance with his aunt (Sara) prior to August 3 (when she arrived at his mother's home) had been very much limited. It is not a legal requirement, however, that there be an extended period of business or accommodation transactions or dealings between persons in order for a confidential relationship to be established between them.

In volume 23, American Jurisprudence, page 764, it is said: "It is settled by an overwhelming weight of authority that the principle [as to confidential relationship] extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal. It may be moral, social, domestic, or merely personal. Hence, the rule embraces both technical fiduciary relations and those informal relations which exist wherever one man trusts in and relies upon another." This quotation from American Jurisprudence is set forth with approval in *Bolander* v. *Thompson*, 57 Cal. App.2d 444, 447 [134 P.2d 924]. In the last cited case it is stated, at page 447: "The accepted rule is that such a [confidential] relation may exist upon showing of special circumstances of the particular case." The above stated principle, from American Jurisprudence, is adopted in *Estate of Bliss*, 199 Cal.App.2d 630, 640 [18 Cal.Rptr. 821].

In *Kent* v. *First Trust & Savings Bank*, 101 Cal.App.2d 361, 370 [225 P.2d 625], it is said: "The amount of evidence necessary to establish a confidential relationship ordinarily rests with the trier of facts. . . . 'If the parties be friends, and the grantor repose confidence in the grantee, especially if in addition there exist an advisory business relationship, and the one reposing confidence be of advanced age, an implied trust may result.' "

In *Gross* v. *Needham*, 184 Cal.App.2d 446, 456-457 [7 Cal.Rptr. 664], it is said: "It has been repeatedly held that the amount of evidence necessary to establish such [confidential] relationship ordinarily rests with the trier of fact [citations]; in that connection, the trial court was entitled to consider whether confidence was in fact resposed 'which invests the person trusted with an advantage in treating with the person so confiding' [citations] as well as the blood relationship between the parties which 'is an important factor in de-

termining whether in fact a confidential relationship existed.' "

In the present case, Sara, who was found unconscious on the beach, was taken to a hospital where she remained five days. She left the hospital against medical advice and was taken to the home of her sister on August 3rd about 5 p.m. On the way there she had a headache, her head felt pretty bad, and she vomited. About an hour after she was in the house, the defendant Thomas, her nephew, arrived and noticed that she was fatigued. She was suffering from a severe chronic brain syndrome and senile psychosis. Also, according to the opinions of two doctors who treated her at the hospital, she was not competent on that day or the following several days to understand the nature of business transactions. During that evening Thomas continually asked her if he could do anything for her. She expressed concern about conditions at her apartment in Long Beach, and he agreed to go there and check the conditions. During the same evening, she told him the secret concerning her wealth, which secret she had kept from her relatives for many years; and she asked where her bank passbooks were. He proceeded immediately to make an inquiry of his mother regarding the books, and thereupon she produced them. (The record does not disclose the manner in which the books were brought to the house.) He asked what she was going to do with all this money, and he also asked her to explain what stocks she had. Although the matter of the amount of her wealth and the various items comprising it had been a carefully kept secret for many years, she discussed with him the items comprising her wealth and she showed the bank books to him. He asserts that, in response to his question as to what she was going to do with all her money, she said that she would like to give some of it to him. The next morning, August 4th, while she was in the same bad physical and mental condition, he asked her (according to his testimony) how they should go about making the transfers she had in mind the night before. Also, according to his testimony, she told him to get the necessary information as to procedures, and she permitted him to take her passbooks with him. Two days later, while she was in the same bad physical and mental condition, he presented the blank withdrawal cards to her and had her sign them in blank. Under the evidence herein the court could reasonably find that she reposed trust and confidence in him. The finding that a confidential relationship existed between them is supported by the evidence.

Since a confidential relationship existed between them, it cannot be said that the court applied an erroneous theory of the burden of proof, as contended by appellants. It is clear that Thomas gained a tremendous advantage over his aunt as a result of the transactions—he did not part with anything of value as consideration for the transfer to him of her bank accounts in the amount of more than $200,000. Since a confidential relationship existed between them and he gained such a financial advantage over her, and since she did not have independent advice, there was a presumption that he unduly exercised influence over her to his own advantage. (See *Gross* v. *Needham,* 184 Cal.App.2d 446, 462 [7 Cal.Rptr. 644].) The burden of proof was upon defendants to overcome the presumption of undue influence. (See *Kent* v. *First Trust & Savings Bank,* 101 Cal.App.2d 361, 372 [225 P.2d 625].) The finding that the transfers were made while she was acting under the undue influence of defendant Thomas is supported by the evidence.

In view of the above conclusions, it is not necessary to determine other contentions on appeal.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied May 21, 1963, and appellants' petition for a hearing by the Supreme Court was denied June 19, 1963.