Filed 3/4/15  Melcher v. Armstrong CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALAN MELCHER et al., | B255470 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. LC099216) |
| RONALD ARMSTRONG et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Frank Johnson, Judge.  Affirmed.

Lieber Williams & Labin, Stanley P. Lieber and Kathy Belous for Plaintiffs and Appellants.

Golden • Kopcke and David B. Golden for Defendants and Respondents.

Alan Melcher (Melcher) and M3Travel (appellants)[1] appeal from a judgment of dismissal entered after the trial court sustained without leave to amend a demurrer filed by respondents Ronald Armstrong, Padma Armstrong, and GT Trends, Inc. (respondents) to appellants' second amended complaint (SAC).

## CONTENTIONS

Appellants contend that the trial court erred when it (1) found that the statutes of limitation governing appellants' breach of contract and fraud causes of action were not tolled by the discovery rule; (2) ruled that appellants pled insufficient facts regarding respondents' alleged acknowledgements to pay pursuant to Code of Civil Procedure section 360; (3) found that the statute of frauds bars recovery; (4) held that appellants' second amended complaint failed to plead fraud with particularity; and (5) failed to rule in appellants' favor on their alter ego allegations.

## FACTUAL AND PROCEDURAL BACKGROUND

### The original complaint and demurrer

Appellants filed their initial complaint in this action on December 10, 2012. The initial complaint pled two causes of action for breach of contract and fraud. Specifically, appellants alleged that in May 2007 a written agreement was made between Melcher and respondents by which respondents expressly agreed to transfer company inventory to Melcher. Appellants alleged that before and during the time of contracting, representations were made by respondents as to the amount of income this inventory was generating. In reliance on these representations, appellants paid $90,000 pursuant to the agreement.

On or about April 2009, respondents breached the agreement by failing to transfer anything of real value to appellants. While respondents had represented that the company inventory was generating $15,000 per month, and the online tracking system was showing monthly earnings averaging $12,000 per month, nothing was paid to appellants after a check received in April 2009.

---

[1] M3Travel is a general partnership between Melcher and his son, Adam Melcher (Adam).

In their second cause of action for fraud, appellants alleged that defendants specifically represented that the inventory identified in the written contract was generating $15,000 per month. Further, respondents represented that the overall value of the company inventory was well over what it was actually worth. Such misrepresentations came in the form of emails, various phone conferences and other acknowledgements by respondents. Despite such representations, appellants received nothing after April 2009, although respondents continued to falsely assure appellants that they would receive future income. Appellants alleged that respondents were running a Ponzi scheme.

Appellants further alleged that prior to and at the time of contracting with appellants, respondents made representations regarding the monthly value and the overall value of the company inventory, yet at all relevant times knew that such representations were false.

Appellants alleged that they were entitled to return of the money paid to respondents as well as interest on that money, in an amount of at least $130,000, as well as punitive and exemplary damages.

Appellant attached to the complaint a copy of the written agreement. The agreement, dated May 24, 2007, is captioned "Transfer of Ownership and Bill of Sale." The agreement does not make mention of any specific income that would be generated from the business.

On February 7, 2013, respondents filed a demurrer to the initial complaint. Respondents argued that the first cause of action for breach of written contract was barred by the four-year statute of limitations found in Code of Civil Procedure section 337, as the complaint was not filed until five and a half years after the contract was signed. If nothing of value was transferred pursuant to the contract, then the lawsuit should have been filed within four years of the date of the contract. Respondents pointed out that nothing in the contract stated that appellants would receive a specified monthly amount of income. If the cause of action were for the breach of an oral contract to pay a certain sum of money each month, respondents argued, then the claim is still barred by the two-

3

year statute of limitations for breach of an oral contract found in Code of Civil Procedure section 339.

Respondents also demurred to the second cause of action for fraud on the ground that it is barred by the three-year statute of limitations found in Code of Civil Procedure section 338.  Appellants alleged that in spite of oral assurances, they received no income after April 2009.  Thus, the complaint should have been filed at the very latest within three years of April 2009, or April 2012.  Because it was filed in December 2012, respondents argued, the fraud cause of action is barred by the statute of limitations.

Respondents' demurrer was sustained and appellants were granted 20 days leave to file an amended complaint.[2]

**The first amended complaint (FAC) and demurrer**

Appellants filed their first amended complaint on April 19, 2013.  The complaint purported to allege three causes of action, for breach of written contract, fraud, and "piercing the corporate veil."

Appellants alleged that GT Trends is a small network marketing company that grants the opportunity for individuals to sign up for and build a business based on the sale of discounted travel through various website services.  Generally, an individual interested in commencing work with GT Trends must pay $229 to start the business.

Beginning in early 2007, Ronald Armstrong and Padma Armstrong lured appellants into contracting with them by asserting that a top-level representative from a business website had moved and the position, with an already established group of representatives, was available.  The Armstrongs represented to appellants that the position came with an income of, on average, $12,000 to $15,000 per month in profits.  Because the business was established with approximately 40,000 representatives included, the profits were assured.  Specifically, the website generated two forms of profits:  weekly bonuses for new members as well as monthly residuals.  The Armstrongs consistently represented that due to fact that this website was already established, the

_____

[2]     The trial court's ruling on the demurrer to the original complaint was omitted from the record.

4

profits of $12,000 to $15,000 per month were certain.  Appellants were informed by the Armstrongs that because this website was already established, appellants as purchasers would not qualify for the usual $229 fee.  Instead, they would have to pay $90,000 in order to purchase the position.

Relying on the Armstrongs's assurances, on May 29, 2007, appellants agreed to purchase the representative position and the contract was signed by the parties.  The contract stated, "[a]ll previous and future qualifications apply to sales volume/bonuses/ commissions associated to business center tr06204 [the site]" and that "[s]aid business center will be eligible to qualify for all forms of compensation/bonuses/commissions applicable beginning with the activation date."  Appellants allege that the "'previous sales volumes, bonuses and commissions'" referred to in the contract were the alleged $12,000 to $15,000 monthly income that respondents promised to appellants.

After the purchase, appellants received the following payments:

On or about June 7, 2007, respondents paid appellants a $1,195 bonus for new members.

On or about June 14, 2007, respondents paid appellants a $795 bonus for new members.

On or about June 23, 2007, respondents paid appellants a $400 bonus for new members.

On or about July 12, 2007, appellants received half of their monthly residual in the amount of $6,030 for the month of April 2007.  Respondents requested an extension to pay the other half of April's monthly residuals.[3]

On or about August 13, 2007, appellants received the second half of their monthly residual in the amount of $6,030 for the month of April 2007.

On or about August 7, 2007, appellants received the amount of $11,515 for the month of May 2007.  This was the second, and last, monthly residual that appellants received.

---

[3]     It is not clear why appellants were owed money for April 2007 when the contract was not signed until May 2007.

The weekly bonus for new members continued up and through April 7, 2009, when appellants received the last weekly bonus in the amount of $95.

Appellants further alleged that from the commencement of the business transaction, up until the summer of 2011, respondents made misleading statements and concealments to string appellants along. These misrepresentations included "empty promises, intentionally false representations and meager weekly bonuses."

Specifically, on August 21, 2007, Adam sent GT Trends an email indicating that 11 messages from the previous Tuesday through Friday had gone unanswered. The email referenced unpaid sales bonuses due and the continued assertion by respondents that the funds would be in appellants' account shortly. Adam asserted that "'[i]f my checks need to be a little late so everyone else gets there's [*sic*] on time, I am fine with that because I see the bigger picture, but if my checks don't show and I only get one returned call in 14 messages over a 10 day period, then I am dead in the water.'"

On February 8, 2008, an email from GT Trends acknowledged money owed to appellants in a Microsoft Excel spreadsheet. The email admitted that the unpaid balance due for the months of June 2007 to November 2007 was $55,405.

On April 29, 2008, another email was received by appellants from respondents with an attached Microsoft Excel spreadsheet indicating the bonuses due and money owing that respondents promised to pay up to and through April 10, 2008.

Appellants also alleged that between 2009 and 2011, respondents sent "numerous" text messages to appellants indicating that the money owed would be forthcoming. "Countless" telephone conversations took place as well.

Adam sent Ronald and Padma Armstrong an email on July 14, 2010, stating, "'I am wondering if I have done something to offend you [. . .] as it seems everybody can get a hold of you except me.'" Melcher had a personal and business relationship with the Armstrongs, therefore "bringing legal action was the last thing on his mind." After the summer of 2011, answers to emails, text messages and phone calls terminated.

In addition to the causes of action for breach of written contract and fraud, appellants alleged that the separateness of GT Trends's corporate identity should be ignored.

On May 1, 2013, respondents filed their demurrer to the FAC, including arguments that both the breach of contract and fraud causes of action were barred by the applicable statutes of limitation. On August 13, 2013, the trial court sustained respondents' demurrer to the FAC. Appellants were granted 20 days to file an amended complaint.

In its detailed ruling, the trial court noted that for purposes of accrual of the statute of limitations, notice is triggered by suspicion. (Citing *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1111; *E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1319.) The trial court reasoned:

> "By the end of August 2007, [respondents] had stopped sending [appellants] monthly payments that were anywhere close to the alleged promise of $12,000 to $15,000 a month. [Appellants] claim that [respondents] occasionally made substantially smaller monthly payments in the form of new member bonuses. Considering that [appellants] claim to have paid $90,000.00, and were allegedly promised some $12,000 to $15,000 a month, a reasonable person would not have been satisfied with years of promises and assurances that were not backed up by any actual payments or other forms of concrete action.
>
> "Thus based on their allegations, by the end of August 2007, [appellants] should have had suspicions regarding [respondents'] intentions."

The trial court noted that the Code of Civil Procedure provides an exception to the running of the statute of limitations where there is a signed, written promise to pay. The court acknowledged that appellants alleged numerous text messages and emails containing promises to pay. However, the court held, "there are no allegations that [respondents] signed any such promises and the court finds no authority for the proposition that text messages and emails are sufficient." The court concluded that

7

appellants again failed to plead around the applicable statutes of limitation and again failed to plead fraud with particularity.

**The SAC and demurrer**

Appellants filed the SAC on September 11, 2013. In the SAC, appellants made several changes. They omitted allegations that "[respondents] could not guarantee that the website would generate $15,000 *every* month." Appellants inserted new language stating that the Armstrongs represented that the site would guarantee income of $12,000 to $15,000 per month.

Appellants also added allegations that respondents "exploited" a close and personal relationship with appellants. Appellants alleged that this close and personal relationship existed between respondents and Adam, appellant Melcher's son. The new allegations asserted that Ronald Armstrong was a groomsman at Adam's wedding in Hawaii in 2008, and that in 2010, Adam traveled to San Francisco with respondents for a weekend getaway. Due to this and "countless" other events, appellants believed that respondents had good intentions. Instead, respondents strategically continued to maintain close relations with appellants in order to deter suspicion of their fraud.

In addition, appellants added allegations that there were "electronic signatures" at the end of each email and text message which, pursuant to Civil Code section 1633.2, subdivision (h), constituted written and signed acknowledgements with intent to sign those electronic communications. Appellants further alleged that pursuant to Civil Code section 1633.7, respondents' promises to pay money owed in the form of emails and text messages were satisfactory writings under the law.

Appellants further added allegations that in the spring of 2012, Adam was contacted by Ken Clawson, who had discovered that there were others in respondents' company with similar stories of false promises and fraud. Clawson told Adam that he had filed suit against Ronald Armstrong and had won a $160,000 default judgment. After learning of this, appellants and appellants' son realized that respondents' actions were part of a larger pattern of fraudulent behavior. With the discovery of Clawson's lawsuit,

8

their friendship and trust towards the Armstrongs was broken, and they decided to exercise their legal rights.

On September 27, 2013, respondents filed a demurrer to the SAC. Respondents reiterated that the contract at issue does not promise any dollar amount in monthly income. In addition, respondents again argued that the breach of contract claim is barred by the statute of limitations. Any claim on the written contract was required to be filed within four years of May 24, 2007, and any claim on an oral contract would have had to be filed within two years of April 2009, which was when the last check was allegedly received. Respondents argued that the alleged electronic signatures were insufficient to create or renew any obligation to the appellants, and that any oral agreement that appellants would receive $12,000 to $15,000 per month was barred by the statute of frauds.

As to the fraud claim, respondents argued that it is barred by the three-year statute of limitations. Respondents specified that because the last payment was allegedly made on April 7, 2009, the lawsuit should have been filed by April 2012. Respondents also argued that appellants failed to provide allegations showing that any representation was false at the time it was made, and that piercing the corporate veil is not an independent cause of action and must fail with the breach of contract and fraud causes of action.

On January 31, 2014, the trial court filed its order sustaining the demurrer to the second amended complaint without leave to amend and dismissal. The trial court concluded that appellants' causes of action are barred by the statute of limitations. The court noted that by the end of August 2007, respondents had stopped sending appellants payments anywhere close to the $12,000 to $15,000 per month that was allegedly promised. Thus, by the end of August 2007, appellants should have had suspicions regarding respondents' intentions. The trial court acknowledged that there is an exception under Code of Civil Procedure section 360 where the defendant promises in writing to pay what is owed on a contract. However, the trial court found no authority that emails and text messages are sufficient to satisfy this statute.

9

As to an alleged modification to the contract with an oral agreement to pay $12,000 to $15,000 per month, the trial court found that any such oral modification is barred by the statute of frauds because such a promise would not be performed within a year of the promise.

Because appellants had two previous attempts to plead facts to overcome the applicable statutes of limitation, the trial court sustained the demurrer without leave to amend.

On April 1, 2014, appellants filed their notice of appeal.

## DISCUSSION

### I.  Standard of review

On appeal from a judgment of dismissal after a demurrer is sustained without leave to amend, we review the legal sufficiency of the complaint de novo.  (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790.)  "The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded.  [Citations.]  The court does not, however, assume the truth of contentions, deductions or conclusions of law.  [Citation.]  The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken.  [Citations.]'  [Citation.]  However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory.  [Citation.]  And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment.  [Citation.]"  (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.)

### II.  Causes of action are time-barred on the face of the SAC

#### A.  *Applicable law*

Statutes of limitation "'prescribe the periods beyond which' a plaintiff may not bring a cause of action.  [Citations.]"  (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 395 (*Norgart*).)  The purpose of these statutes is to protect defendants from the claims of dilatory plaintiffs, and to stimulate plaintiffs to assert fresh claims against defendants in a

10

diligent fashion.  (*Ibid*.)  The statute of limitations operates in an action as an affirmative defense.  (*Id.* at p. 396.)  Under the statute of limitations, a plaintiff must bring a cause of action within the limitations period applicable thereto after accrual of the cause of action. (*Id.* at p. 397.)

"The general rule for defining the accrual of a cause of action sets the date as the time 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises.'  [Citation.]"  (*Norgart, supra*, 21 Cal.4th at p. 397.)  "In other words, it sets the date as the time when the cause of action is complete with all of its elements.  [Citations.]"  (*Ibid.*)

An important exception to the general rule for defining the accrual of a cause of action is the discovery rule.  (*Norgart, supra*, 21 Cal.4th at p. 397.)  The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action.  [Citations.]"  (*Ibid.*)  A plaintiff discovers a cause of action when he at least *suspects* a factual basis, as opposed to a legal theory, for its elements. (*Ibid*.)  The plaintiff "has reason to suspect" when he has "''''''notice or information of circumstances to put a reasonable person *on inquiry*.''''''"  (*Id.* at p. 398.)  The plaintiff need not know "''specific "facts" necessary to establish' the cause of action; rather, he may seek to learn such facts through the 'process contemplated by pretrial discovery'; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place -- he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go find' them himself if he can and 'file suit' if he does.  [Citation.]"  (*Ibid*., fn. omitted.)

Where the facts are undisputed, the accrual of a cause of action may be determined as a matter of law.  (*Thomson v. Canyon* (2011) 198 Cal.App.4th 594, 604.)

### B.  *Accrual of causes of action*

According to the SAC, the written contract at issue was signed in May 2007. Pursuant to the written terms of the contract, appellants purchased inventory and ownership rights to Business Center tr064204.  The contract specified that "All previous and future qualifications apply to sales volume/bonuses/commissions associated to

business center tr064204." In addition, it specified that "Said business center will be eligible to qualify for all forms of compensation/bonuses/commissions applicable beginning with the activation date."

Prior to signing the contract, respondents consistently represented to appellants that the website would generate profits of $12,000 to $15,000 per month. It was in reliance upon these oral representations that appellants signed the contract. The signing of the written contract, and the alleged oral modifications to this written contract, all occurred in or around May 2007. Appellants allege that respondents never intended to compensate appellants pursuant to the contract and refused to perform the terms of the contract by failing to compensate appellants as agreed in the contract. Thus, according to appellants' allegations, the wrongful act was committed in May 2007. The breach of contract was committed shortly thereafter, in August 2007, when respondents stopped providing the guaranteed $12,000 to $15,000 monthly compensation. (*Norgart, supra*, 21 Cal.4th at p. 397.)[4]

However, appellants argue that they did not discover their causes of action at the time of injury. Thus, we must analyze the facts to determine when appellants at least suspected a factual basis for their claims. (*Norgart, supra*, 21 Cal.4th at p. 397.)

The following payments were made on the contract: (1) June 7, 2007, a $1,195 bonus for new members; (2) June 14, 2007, a $795 bonus for new members; (3) June 23, 2007, a $400 bonus for new members; (4) July 12, 2007, half of the monthly residual for April 2007 in the amount of $6,030; (5) August 13, 2007, the second half of the monthly residual for the month of April 2007 in the amount of $6,030; and (6) August 7, 2007, the monthly residual for the month of May 2007 in the amount of $11,515.

---

[4]    Because the breach occurred at the time of contracting, or shortly thereafter when the promised $12,000 to $15,000 monthly payments ceased, the doctrine of anticipatory breach does not apply. (See, e.g., *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 489 ["[I]f a party to a contract expressly or by implication repudiates the contract before the time for his or her performance has arrived, an anticipatory breach is said to have occurred"].)

12

The payment received on August 7, 2007 was the "second, and last, monthly residual" that appellants received. Although appellants continued to receive weekly bonuses for new members through April 2009, they did not receive anything close to the $12,000 to $15,000 per month that they were promised under the alleged oral modifications to the written contract. Appellants allege that the money initially used to pay them was obtained from the original $90,000 that appellants had given to respondents, as opposed to profits earned by appellants from the business.

The allegations of the SAC show that appellants had begun to suspect respondents' alleged breach of contract and fraud by late August 2007. On August 21, 2007, Adam sent GT Trends an email indicating that "11 messages from Tuesday through Friday have gone unanswered" and that he was "crippled" from "running his army" because none of the promised funds were forthcoming. Adam wrote, "'if my checks don't show and I only get one returned call in 14 messages over a 10 day period, then I am dead in the water.'" In response, Padma Armstrong allegedly concocted excuses as to why Ronald Armstrong had not responded, and assured appellants that "the promised funds will be available shortly."

The contract, including the alleged promise of $12,000 to $15,000 per month income, was made in May 2007. Appellants allege that they received the promised income for the months of April and May 2007, but never for any other month. By late August 2007, respondents began to avoid responding to appellants' messages. Adam communicated his frustration to respondents. He was met with excuses. Under these undisputed facts, we find that as of August 2007, appellants had reason to suspect the factual basis for their claims and had an affirmative obligation to discover the facts supporting their causes of action. (*Norgart, supra*, 21 Cal.4th at p. 398.)

### C. *Each cause of action is barred under the statute of limitations*

Appellants purported to file three causes of action against respondents. Each cause of action arises from the same set of facts pled in the SAC. As set forth above, accepting those facts as true, appellants' causes of action arose no later than August 2007.

13

### 1. Breach of written contract

A cause of action for breach of written contract is subject to a four-year statute of limitations. (Code Civ. Proc., § 337.)[5] Under the facts pled in the SAC, appellants' cause of action for breach of written contract had to be filed no later than August 2011. Appellants' December 2012 filing is untimely.

### 2. Fraud

A cause of action for fraud is subject to a three-year statute of limitations. (Code Civ. Proc., § 338, subd. (d).) Under the facts pled in the SAC, appellants' cause of action for fraud had to be filed no later than August 2010. Appellants' December 2012 filing is untimely.

### 3. Piercing the corporate veil

Behaving as an alter ego is not in itself actionable. Instead, "[a]lter ego is essentially a theory of *vicarious* liability under which the owners of a corporation may be held liable for harm for which the corporation is responsible where, because of the corporation's utilization of the corporate form, the party harmed will not be adequately compensated for its damages. [Citation.]" (*Doney v. TRW, Inc.* (1995) 33 Cal.App.4th 245, 249.) Because appellants' alter ego allegations do not present a separate substantive claim, they must be dismissed along with the other two causes of action.

## III. The facts alleged in the SAC do not permit tolling of the statutes of limitation under any of appellants' theories

### A. *Code of Civil Procedure section 360*

Code of Civil Procedure section 360 (section 360) is found in title 2 of part 2 of the Code of Civil Procedure, which sets forth the statute of limitations for various causes of action. The statute provides, in relevant part: "No acknowledgement or promise is

---

[5] A written contract may be modified by an oral agreement. (Civ. Code, § 1698.) For the purposes of this discussion we assume that the oral modification alleged in this matter was valid. Neither party has presented any argument that an oral modification to a written contract serves to change the relevant statutory period of limitation. Therefore we apply the four-year limitation period set forth in Code of Civil Procedure section 337 to appellants' cause of action for breach of written contract.

14

sufficient evidence of a new or continuing contract, by which to take the case out of the operation of this title, unless the same is contained in some writing, signed by the party to be charged thereby." Thus, section 360 permits a debtor's acknowledgement of a debt to start a new statutory period. However, the acknowledgement or promise must be in writing and signed by the debtor.

Under section 360, the promise to pay an existing debt must be distinct and unqualified:

> "'The distinct and unqualified admission of an existing debt contained in a writing signed by the party to be charged, and without intimation of an intent to refuse payment thereof, suffices to establish the debt to which the contract relates as a continuing contract, and to interrupt the running of the statute of limitations against the same.'"

(*Western Coal & Mining Co. v. Jones* (1946) 27 Cal.2d 819, 823.)

"The new acknowledgement or promise may be gathered from several writings with reference to and connected with the subject matter. [Citation.]" (*Weatherwax v. Hills* (1931) 113 Cal.App. 557, 560.) However, it must provide an "unqualified, unconditional recognition" of the obligation. (*Ibid*.)

Appellants have not alleged the existence of any such distinct and unqualified writing which serves to prevent the bar of the statute of limitations in this case. Appellants allege generally that after the month of May was fully paid out, they patiently awaited their monthly residuals for June 2007. Instead they were met with "a string of empty promises, intentionally false representations and meager weekly bonuses." Appellants also alleged generally that such false representations "came in the form of emails, telephone communications, and text messages." These general allegations fall short of section 360's requirement of a distinct and unqualified admission of an existing debt.

Appellants describe a few specific communications that passed between the parties. The first specific example is the email exchange which commenced on August 21, 2007. Even if such an email exchange could have amounted to an unqualified

15

admission of an existing debt, appellants' cause of action for breach of written contract would still have expired on August 21, 2011, and appellants' December 2012 filing is still untimely.

Appellants reference two Microsoft Excel spreadsheets which were allegedly emailed from GT Trends, acknowledging an unpaid balance. The two emails were allegedly received by appellants on February 8, 2008 and April 29, 2008. Appellants allege that both emails were electronically signed and acknowledged by respondents. Even if these emails could have amounted to unqualified admissions of debt, appellants' cause of action for breach of written contract would still have expired no later than April 29, 2012. Appellants' December 2012 filing is still untimely.

Appellants allege generally that between 2009 and 2011, respondents sent numerous text messages to appellants "corroborating the above-noted emails, indicating that the monies due and owed to [appellants] was coming." "Countless" telephone conversations to that effect also took place. Each time, a new excuse was formulated as to why the funds were not forthcoming. Appellants allege, "[respondents] did not lack creativity when it came to assuring [appellants] that the money earned was on its way." These general allegations do not meet the requirements of section 360. There is no allegation of a specific written acknowledgement that appellants are owed $12,000 to $15,000 per month for the past two to four years, signed by a particular individual. The reference to the "money earned" is not sufficiently precise, nor is the dollar amount. There is no reference to the oral modification of the May 2007 contract. In addition, respondents' alleged excuses certainly qualified their alleged assurances, and intimated an intent to refuse payment. In sum, these vague allegations do not serve to toll the statute of limitations under section 360.

Appellants describe a July 6, 2010 email from Adam to Ronald Armstrong in which Adam "confirmed Ronald Armstrong's representations that a new business abroad should help finance the obligations due to [appellants] at home." Adam informed respondents in this email that certain money was due. A writing from the alleged creditor to the alleged debtor does not serve to meet the requirements of section 360. There is no

16

allegation that respondents acknowledged any debt at that time, much less provided a distinct and unqualified admission of any such debt.

Finally, appellants allege that "in 2011" the Armstrongs "assured [appellants] that funds were being held up on the [*sic*] Philippines by HSBC and once they were freed, the influx of hundreds of thousands of dollars from such would be used to pay [appellants] the monies due and owed to them." Again, this allegation falls short of the requirements of section 360. It does not provide an unqualified recognition of any specific debt. Certainly, after years of false promises and excuses, respondents' representation that the money must be "freed" before payment takes this communication out of the parameters of section 360. (*Western Coal & Mining Co. v. Jones, supra*, 27 Cal.2d at p. 823 [admission of debt must be unqualified without intimation of intent to refuse payment].) Appellants have failed to allege that the statute of limitations for breach of contract was tolled under section 360 by any unqualified written admission of a specific debt.[6]

### B. Discovery rule

Appellants argue that a "defendant's fraud in concealing a cause of action against him will toll the statute of limitations." (*Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 637.) Whether reliance on the concealing fraud was reasonable is a question of fact for the jury, and may be decided as a matter of law only if the facts permit reasonable minds to come to just one conclusion. (*Ibid.*) Appellants argue that here, the facts do not permit reasonable minds to come to just one conclusion.

Appellants argue that they have pled facts showing the existence of a confidential relationship between the parties, and that such relationship prevented appellants from

---

[6] Appellants argue extensively that the text messages and emails were electronically signed by respondents and that such electronic signatures should not be denied legal effect pursuant to Civil Code section 1633.7, which provides that "[a] record or signature may not be denied legal effect or enforceability solely because it is in electronic form." As set forth above, the emails and text messages alleged do not satisfy the requirements of section 360 because they are not distinct and unqualified admissions of existing debt. Therefore, we need not address appellants' argument that such emails and texts should be considered signed writings under section 360.

actual or inquiry notice of the fraud.  In support of this claim, appellants cite *Lee v. Escrow Consultants, Inc.* (1989) 210 Cal.App.3d 915, 921 (*Lee*).  *Lee* is distinguishable.  There, the Court of Appeal noted that an escrow holder is a fiduciary of the parties to an escrow.  This fiduciary relationship between the plaintiff and the defendant relaxed the plaintiff's duty to inquire into the circumstances surrounding the alleged fraud.  Under the circumstances, the nature of the relationship between the parties caused the plaintiff to rely on the defendant's assurances, thus tolling the statute of limitations.  (*Id.* at pp. 921-922.)  Appellants cite no law suggesting that there exists a fiduciary relationship between parties to the type of contract that existed between appellants and respondents here.[7]

In a related argument, instead of using the word "fiduciary," appellants argue that there was a close, confidential relationship between the parties and the statute of limitations should be tolled for that reason.  In support of this argument, appellants cite *Vai v. Bank of America Nat'l Trust & Sav. Assoc.* (1961) 56 Cal.2d 329.  *Vai* involved the fiduciary relationship of a husband towards his wife where the husband maintains control over the community property.  (*Id.* at p. 338.)  *Kent v. First Trust & Sav. Bank* (1950) 101 Cal.App.2d 361 involved an individual's undue influence over an elderly woman.  The allegations stated that "by reason of [the elderly woman's] age and physical condition her mental faculties were impaired and she was easily influenced by those in whom she had confidence."  (*Id.* at p. 370.)  Neither case supports appellants' position that a confidential relationship may be found under the circumstances of this case.  In contrast, the existence of a close friendship between the parties to a business transaction generally will not give rise to a confidential relationship.  (See, e.g., *Wilson v. Sampson* (1949) 91 Cal.App.2d 453, 459 ["friendship, affection, and even intimacy existing between two parties does not constitute a confidential relationship"]; *Peters v. Papoulacos* (1963) 218 Cal.App.2d 791,

---

[7]     *L. B. Laboratories, Inc. v. Mitchell* (1952) 39 Cal.2d 56, also cited by appellants, involved a dispute between a certified public accountant and his client.  Accountants, like escrow agents, owe fiduciary duties to their clients.  (*Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 40.)

18

794 ["'the solitary fact of a family relationship will not of itself alone establish the existence of a fiduciary or confidential relation'"].) Thus, appellants' duty to inquire was not relaxed and they are held to the duty of inquiry that ordinarily applies between parties to business transactions. (See *Committee on Children's Television, Inc v. General Foods Corp.* (1983) 35 Cal.3d 197, 222, superseded by statute as stated in *Californians For Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227 ["The relationship of seller to buyer is not one ordinarily vested with fiduciary obligations"].)

Appellants further contend that respondents should be estopped from asserting the statute of limitations defense because it was respondents' conduct that induced the belated filing of this action. Appellants cite *Velasquez v. Truck Ins. Exchange* (1991) 1 Cal.App.4th 712, 723, which describes the doctrine as "'"some conduct by the defendant, relied on by the plaintiff, which induces the belated filing of the action." [Citation.]' [Citation.]" However, "whether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts. [Citation.]" (*Guido v. Koopman* (1991) 1 Cal.App.4th 837, 843-844.)

Here, appellants allege that they were promised an income of $12,000 to $15,000 per month as a result of the purchase of inventory that they made in May 2007. They received adequate payments for the months of April and May 2007, with the last payment made on or about August 7, 2007. Appellants allege that they relied on respondents' false assurances of payment, including numerous excuses, for over five years before filing suit. Under these circumstances, we conclude as a matter of law that any such reliance was not reasonable. (See, e.g., *Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1195-1197 [landlord's representation that "'we'll take care of it'" insufficient for reasonable reliance as a matter of law in light of plaintiff's continued observation of trespassing vehicles over property, among other things].)[8]

---

[8] Because we have determined that appellants' causes of action are barred under the applicable statutes of limitation, we need not address appellants' arguments that the trial court erred in concluding that the statute of frauds bars the instant action and that appellants failed to plead fraud with particularity.

**IV.  The trial court did not abuse its discretion in sustaining the demurrer without leave to amend**

After permitting appellants two opportunities to amend their complaint, we find that the trial court did not abuse its discretion sustaining respondents' demurrer to the SAC without leave to amend.  Appellants have failed to demonstrate that the defects in the SAC can be cured by amendment.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.

CHAVEZ

We concur:

_____, P. J.

BOREN

_____, J.

HOFFSTADT

20